# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| State Farm Mutual Automobile Insurance Company, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| Yuri Fayda, M.D, | ) | |
| Hadassah Lee Orenstein, M.D., | ) | Case No. 14-CV-9792(WHP) |
| Dyckman Neighborhood Medical, P.C., | ) | |
| Stanislav Lentsi, | ) | |
| Dyckman Management Corp., | ) | |
| | ) | Hon. William H. Pauley III |
| Michael Gorelik, D.C., | ) | |
| Alen Oven Chiropractic Care, P.C., | ) | |
| | ) | |
| David Emil Aguilar, D.C., | ) | |
| DA Chiropractic P.C., | ) | |
| | ) | |
| Nachmy Bronstein, D.C., | ) | |
| Spinergy Chiropractic, P.C., | ) | |
| | ) | |
| Arkady Kiner, | ) | |
| Contemporary Acupuncture, P.C., | ) | |
| | ) | |
| Igor Vatelman, | ) | |
| Royal Massage Therapy, P.C., | ) | |
| | ) | |
| Irfan Alladin, M.D., | ) | |
| Accelerated Rehab & Pain Management, P.A., | ) | |
| Accelerated Surgical Center of North Jersey, L.L.C., | ) | |
| Sam Rahat Muqtadir, a/k/a Sam Rahat | ) | |
| ASC MedSolutions, L.L.C., | ) | |
| Defendants. | ) | |

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF STATE FARM'S MOTION TO COMPEL COMPLETE RESPONSES TO STATE FARM'S FIRST SET OF INTERROGATORIES AND DOCUMENT REQUESTS TO KINER DEFENDANTS

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................ 1

II.     RELEVANT PROCEDURAL HISTORY ....................................................... 1

III.    FACTUAL BACKGROUND ......................................................................... 2

IV.    LEGAL STANDARDS ................................................................................. 6

V.     ARGUMENT ............................................................................................... 7

   A.   Bank Records and Tax Returns Should Be Produced.......................................... 7

      1.   Bank Records and Tax Returns Are Relevant and Discoverable. .................................. 8

      2.   This Court Has Already Ruled on the Discoverability of Bank Records and Tax Returns in This Case. ........................................................................................... 11

      3.   Defendants' Objections to Production of Bank Records and Tax Returns Are Without Merit............................................................................................................. 12

   B.   Documents from Kiner's Other Professional Corporations and Healthcare Practices Are Discoverable. ............................................................................................... 14

VI.    CONCLUSION........................................................................................... 17

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Andrews v. Cruz*,
    2006 WL 1984650 (S.D.N.Y. July 14, 2006) ..........................................................6

*Banco Cent. de Paraguay v. Paraguay Humanitarian Found., Inc.*,
    2006 WL 3456521 (S.D.N.Y. Nov. 30, 2006) ......................................................7

*Dean v. Anderson*,
    2002 U.S. Dist. LEXIS 11536 (D. Kan. June 6, 2002) .....................................13

*OHM Res. Recovery Corp. v. Indus. Fuels & Res., Inc.*,
    1991 WL 146234 (N.D. Ind. July 24, 1991) .....................................................11

*Resolution Trust Corp. v. Greif*,
    906 F. Supp. 1446 (D. Kan. 1995) ..............................................................11, 13

*State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs.*,
    375 F. Supp. 2d 141 (E.D.N.Y. 2005) ..............................................................10

*State Farm Mut. Auto. Ins. Co. v. McGee*,
    2012 WL 8281725 (E.D.N.Y. Feb. 21, 2012) .............................................10, 16

*State Farm Mut. Ins. Co. v. Policherla*,
    2009 WL 2170183 (E.D. Mich. July 20, 2009) ................................................10

*U.S. S.E.C. v. Suman*,
    684 F. Supp. 2d 378 (S.D.N.Y. 2010) *aff'd*, 421 F. App'x 86 (2d Cir. 2011) ..........................5

*Uni-World Capital L.P. v. Preferred Fragrance, Inc.*,
    2014 WL 3417281 (S.D.N.Y. July 10, 2014) ....................................................11

*United States v. Chan*,
    2002 U.S. Dist. LEXIS 391 (S.D.N.Y. Jan. 13, 2002) .....................................16

*United States v. Gaoldeberger*,
    12 Cr. 598 (S.D.N.Y.) ........................................................................................4

*United States v. Hatfield*,
    685 F. Supp. 2d 320 (E.D.N.Y. 2010) ..............................................................15

**Rules**

Fed. R. Civ P. 26(b) ..........................................................................................................7

Fed. R. Civ. P. 26(b)(1)..........................................................................................................6

Fed. R. Civ. P. 37(a) ..............................................................................................................7

Fed. R. Evid. 404(b)..............................................................................................................15

Fed. R. Evid. 608(b)..............................................................................................................16

## I.      INTRODUCTION

This motion concerns three categories of information that Defendants Arkady Kiner ("Kiner") and Contemporary Acupuncture, P.C. ("Contemporary") refuse to produce in response to Plaintiff State Farm Mutual Automobile Insurance Company's ("State Farm") First Set of Interrogatories and Document Requests.   In particular, Defendants refuse to produce: (a) Defendant Kiner's bank records; (b) Defendant Kiner's tax returns; and (c) information concerning acupuncture businesses of Defendant Kiner other than Contemporary.   The parties have met and conferred and have been unable to reach a resolution.   Accordingly, for the reasons set forth below, State Farm respectfully requests that the Court compel Defendants to provide the requested discovery.

## II.      RELEVANT PROCEDURAL HISTORY

On March 10, 2015, State Farm served its First Set of Requests for Production to Contemporary and Kiner and First Set of Interrogatories to Contemporary and Kiner.   Copies of State Farm's document requests and interrogatories are attached hereto as **Exhibits A**, **B**, **C**, and **D**, respectively.   Kiner and Contemporary (the "Kiner Defendants") have produced documents and responses on a rolling basis - although not all of the materials requested - and the parties conferred regularly in order to narrow the issues before the Court.

On August 25, 2015, after the parties reached an impasse, State Farm and Kiner Defendants filed a joint letter pursuant to Section III(A)(iv) of Judge William Pauley III's Individual Practices requesting a pre-motion discovery conference to resolve the parties' ongoing discovery dispute.   [Dkt. 108.]   On August 31, 2015, the Court granted State Farm leave to file a formal motion to compel.

### III.    FACTUAL BACKGROUND

State Farm's detailed Complaint describes a scheme in which individuals who have been in automobile accidents are subjected to fraudulent and unnecessary medical care at a multi-disciplinary clinic at 100 Dyckman Street, New York, New York ("100 Dyckman") and other locations.   Compl. ¶ 2.   Defendants submitted bills for reimbursement to State Farm representing that the treatment was provided and was medically necessary and, in reliance on those representations, State Farm paid fraudulent claims.  *Id*. ¶¶ 1-3.  Essential components of the scheme include the multi-disciplinary treatment provided by a variety of providers simultaneously to maximize the amount that can be charged; the pre-determined nature of the treatment in which virtually every patient is diagnosed with virtually identical conditions and receives virtually identical care, regardless of their individualized needs; and control by laypersons or non-physicians who decide what medical care is provided and who gets to provide that care and who collect kickbacks from providers in exchange for access to patients.  *Id*. ¶¶ 3, 5, 6, 40, 41, 127.

Treatment was provided to patients concurrently by a variety of healthcare practitioners – (a) medical doctor Defendants Yuri Fayda and Hadassah Orenstein; (b) chiropractor Defendants Michael Gorelik, David Aguilar, and Nachmy Bronstein; (c) massage therapist Defendant Igor Vatelman; (d) medical doctor Defendant Irfan Alladin, who examined patients at 100 Dyckman and then had them transported to New Jersey, where he performed injections in a facility he owned with Defendant Sam Rahat; and (e) acupuncturist Defendant Kiner, who provided acupuncture treatment to patients through his corporation, Defendant Contemporary.  *Id.* ¶ 5.

The Complaint describes how the treatment provided by these practitioners was fraudulent and medically unnecessary.  In particular, it is alleged that such care was the product of a predetermined medical treatment protocol ("Predetermined Treatment Protocol") in which

2

patients are not legitimately treated, but regardless of their individual conditions, complaints, and needs, each patient is simply diagnosed with the same condition and subjected to the same purported treatments. *Id.* ¶¶ 2-4, 6. The cookie-cutter treatments typically involve identical modalities, tests, and procedures, provided concurrently by multiple practitioners – a medical doctor, a chiropractor, an acupuncturist (Kiner), a physical therapist, and a massage therapist. *Id.* ¶ 5. Patients are also driven to New Jersey for injections. *Id.* ¶ 5(g).

The Complaint details Kiner and Contemporary's rendition of fraudulent and medically unnecessary acupuncture treatment at 100 Dyckman. *Id.* ¶ 23. The acupuncture treatment consisted of "inserting needles into patients in an assembly-line fashion that bears little, if any, relation to the patient's condition and is not designed to effectively treat or otherwise benefit the patients." *Id.* ¶ 126. The bills submitted to State Farm by Contemporary as part of the Predetermined Treatment Protocol were supported by fraudulent examination reports and treatment notes that contained pervasive patterns that were not credible, such as virtually every patient having the same diagnosis and prognosis. *Id.* ¶ 127. Contemporary inserted needles into patients for the sake of expediency, and continued treatment without any indication that patients improved. *Id.* ¶ 127.

Despite the fact that care was medically unnecessary, Defendants, including Kiner Defendants, submitted bills for reimbursement to State Farm and represented that the services were medically necessary and were actually performed when they were not medically necessary and/or were not performed. *Id.* ¶¶ 117-28, 205-07. State Farm relied on the bills and supporting documents submitted by Contemporary and paid the bills. *Id.* ¶¶ 205-09.

The Complaint further alleges that providers of healthcare services at 100 Dyckman, including Kiner Defendants, gained access to patients and were allowed to treat them by paying

kickbacks to non-physician "gatekeepers" who controlled the location and decided what services would be provided to patients and who would provide them. *Id.* ¶¶ 43-44. Those "gatekeepers" include Defendant Lentsi, and also likely Alexander Freed and his wife, Inessa Drabkin. Kickbacks were sometimes disguised as "rent," and sometimes took other forms. *Id.* ¶ 43. To further this façade, Kiner Defendants, along with other providers at 100 Dyckman, entered into form "leases" with Defendant Dyckman Neighborhood, which Lentsi claimed were $500 per month. *Id.* ¶¶ 43-44. Contemporary purportedly "rented" space at 100 Dyckman during a 38-month period at $500 per month, which should amount to $19,000. Yet, bank records and ledgers obtained to date reveal that Contemporary wrote checks to Dyckman Neighborhood and Dyckman Management for almost $100,000 during that period. Furthermore, the checks were for irregular amounts inconsistent with legitimate "rent" payments. (*E.g.*, 6/28/2010 $751; 7/15/2010 $2,384; 7/29/2010 $10,416.50). Contemporary also wrote multiple checks to corporations called TTRT, Inc. and Better Billing, to which Lentsi directed payments be made. Additionally, bank records obtained to date show Contemporary wrote at least 35 checks totaling over $160,000 that were cashed at a check casher, The Money Spot, which was at the center of multiple indictments concerning the avoidance of currency reporting requirements and unlawful laundering of proceeds from healthcare fraud. *See United States v. Gaoldeberger*, 12 Cr. 598 (S.D.N.Y.).

During Defendant Yuri Fayda's August 25, 2015 deposition, he testified that Kiner "loaned" him $30,000 to start Dyckman Neighborhood. (Fayda Deposition Transcript at 36-40.) Dr. Fayda described the "loan" as an interest-free, oral agreement with no collateral down, and no date by which the loan had to be repaid. (*Id.* at 36-37.) He further testified that, to date, he has not paid back any portion of the "loan." (*Id*. at 37.)

4

Defendant David Aguilar, who purported to provide chiropractic services at 100 Dyckman, has now signed an affidavit in which he has acknowledged that Lentsi, "Alex" (Freed) and others controlled his practice, directed activity at 100 Dyckman and pressured him into providing v-sNCT testing and durable medical equipment. (Aguilar Affidavit ¶¶ 12-16, attached as **Exhibit E**.)  Among other things, Aguilar's affidavit states that he was directed to make payments out of his business not only to Dyckman Management and Dyckman Neighborhood, but to TTRT, Inc. and Better Billing. (*Id.* ¶ 9.)

Defendant Lentsi has now been deposed and asserted the Fifth Amendment in response to many questions, allowing for an inference that his answers would be adverse to Lentsi and support State Farm's position. *See U.S. S.E.C. v. Suman*, 684 F. Supp. 2d 378, 386 (S.D.N.Y. 2010) *aff'd*, 421 F. App'x 86 (2d Cir. 2011) ("[a] court may draw an adverse inference against a party who asserts his Fifth Amendment privilege in a civil matter, because the invocation of the privilege results in a disadvantage to opposing parties by keeping them from obtaining information they could otherwise get." (internal citation omitted)).  Among the questions to which Lentsi asserted the Fifth Amendment were the following:

- Do you know a person named Alex Freed?  (Lentsi Deposition Transcript at 9.)

- Do you know a person named Inessa Drabkin?  (*Id.* at 10.)

- Did Alex Freed have access to the Dyckman Management bank account?  (*Id.* at 41.)

- Did you have any conversations with Alex Freed . . . before you started working at 100 Dyckman Street again?  (*Id.* at 67-68.)

- Would you be surprised to know that Dr. Fayda testified he received $30,000 from Arkady Kiner?  (*Id.* at 69.)

- Did you have a role in setting up the amounts that the medical providers would pay for working at 100 Dyckman Street?  (*Id.* at 72.)

5

- Did Alex Freed have a role in determining how much the medical providers would pay for working at 100 Dyckman?  (*Id.* at 72.)

- Isn't it true Kiner paid kickbacks for access to patients at 100 Dyckman Street?  (*Id.* at 96.)

- Didn't Kiner have the same agreement DA Chiropractic [Aguilar's practice] did?  (*Id.* at 96.)

- Who made the final decision as to whether Kiner could work at 100 Dyckman Street?  (*Id.* at 96.)

- Didn't Alex Freed make the final decision as to whether Kiner could work at 100 Dyckman Street?  (*Id.* at 97.)

- Isn't it a fact that you share in the proceeds of Contemporary Acupuncture?  (*Id.* at 100.)

- Isn't it true that the medical providers who worked at 100 Dyckman paid kickbacks in order to get access to patients?  (*Id.* at 101.)

- Isn't it true that the rental agreements purportedly signed by the medical providers were shams to hide those kickbacks?  (*Id.* at 101.)

Thus, Lentsi's assertion of the Fifth Amendment constitutes support for findings that Lentsi and Freed, non-physicians, controlled healthcare services at 100 Dyckman, providers paid kickbacks for access to patients, among the providers who paid kickbacks was Kiner, kickbacks were sometimes designed as rent, and Kiner "loaned" money to Dr. Fayda to further the scheme.

## IV.   LEGAL STANDARDS

Under Federal Rule of Civil Procedure ("Rule") 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."  Thus, upon a showing of "good cause," "the court may order discovery of any matter relevant to the subject matter involved in the action."  Rule 26(b)(1).  "Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  *Id.*; *Andrews v. Cruz*, 2006 WL 1984650, at *2 (S.D.N.Y. July 14, 2006)

("Relevancy is broadly construed to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.").  Indeed, the scope of examination permitted under Rule 26(b) is broader than that permitted at trial and the test is whether the line of interrogation is reasonably calculated to lead to the discovery of admissible evidence.  *Id.*

"Under Federal Rule 37(a), a district court may compel a non-responsive party to provide the requested discovery."  *Banco Cent. de Paraguay v. Paraguay Humanitarian Found., Inc.*, 2006 WL 3456521, at *8 (S.D.N.Y. Nov. 30, 2006).

## V.      ARGUMENT

### A.      Bank Records and Tax Returns Should Be Produced.

Two categories of requests – those seeking bank records and tax information – can be addressed together because the reasons for requiring their production overlap.  In document requests, State Farm seeks, among other things, bank records for bank accounts in the name of Kiner (Request No. #1) and Kiner's federal income tax returns for the years 2009 through the present.  (Request No. #2.)  Interrogatory 1 asks Defendants to identify, among other things, bank accounts in the name of Kiner (Interrogatory No. #1.)[1]

Defendants should be required to produce Kiner's bank accounts and tax records because (1) they are relevant or, at the very least, likely to lead to the discovery of admissible evidence; (2) the Court has already addressed precisely this issue and ruled that such information should be produced; and (3) Defendants' asserted grounds from refusing to provide the materials are without merit.

---

[1] Contemporary's bank records and tax returns have already been identified and produced.

### 1.    Bank Records and Tax Returns Are Relevant and Discoverable.

Bank records and tax returns are relevant and discoverable.   Such information is necessary to:  (1) assess the financial relationship and structure of the alleged RICO enterprise, (2) measure the extent and scope of Defendants' fraud, (3) determine the financial relationship between members of the alleged fraudulent enterprise and third parties, (4) prove Defendants' motive, (5) identify other witnesses who may have participated in the fraudulent scheme, and (6) prove State Farm's damages.

More specifically, such information is relevant to State Farm's allegations that treatment was not provided to patients at 100 Dyckman because it was medically necessary, but because, among other things, money was paid to "gatekeepers" who controlled patients and decided what care patients would receive and who would provide it.  State Farm expects to establish that the providers at 100 Dyckman gained access to patients through illegal kickbacks that were paid to Lentsi, Dyckman Management, Freed and others.   Financial records, including bank records, produced to date have already provided evidence of kickbacks.  For example, bank records of Contemporary, who it is claimed only "rented" space at 100 Dyckman from Fayda for $500 per month (which over the approximately 38 months it treated patients there would amount to around $19,000 in "rent"), reveal that it wrote checks to Dyckman Neighborhood and Dyckman Management for almost $100,000.  These bank records also show Contemporary wrote at least 35 checks totaling over $160,000 that were cashed at a check casher, The Money Spot.  There is no legitimate reason why an acupuncture practice would write so many checks that were cashed at check cashers, and further investigation may show that it was attempting to generate cash in order to pay kickbacks to gain access to patients.  Indeed, Lentsi asserted the Fifth Amendment in response to questions about whether kickbacks were paid for access to patients at 100

Dyckman, and about whether Kiner paid kickbacks for access to patients.  (Lentsi Deposition Transcript at 101.)

Additionally, discovery to date has revealed that the movement of funds, and the use of multiple accounts and complex financial transactions was a critical component of the scheme alleged in the Complaint.  Defendants needed to hide the fact that kickbacks were paid and also that laypeople controlled healthcare practices and were obtaining the majority of profits from those practices.  For example, among the relevant issues will be whether Dr. Fayda or a non-physician owned his medical practice, and relevant to that analysis will be whether Dr. Fayda put up any of his own money to start the practice.  It appears that Fayda did not contribute any capital to starting the business, and that funds used to start the practice were injected through an interest free, $30,000 oral loan from Kiner that has never been paid back.  Similarly, bank records and Dr. Aguilar's affidavit indicate that money was transferred out of healthcare practices at 100 Dyckman to the lay people who controlled activity at 100 Dyckman, Lentsi and Freed, through two apparently unrelated entities, TTRT, Inc. and EBR Network.  Fayda testified at his deposition that he did not know what these payments were for.  (Fayda Deposition Transcript at 99-100.)  Along the same lines, Accelerated Rehab had an account into which it appeared to deposit all payments received for treatment from insurance carriers.  In less than a year, it appears to have moved over $650,000 from that account to another Accelerated Rehab account and written two checks to a GMMI Consulting totaling $600,000, one of which was a $400,000 check with the notation "Gifts and Investment Bonus."  Given the significance of financial transactions to the scheme, and Defendants use of a variety of accounts and multiple transactions not only to advance the scheme but to hide its operation, bank records and tax returns can shed light on Defendants' financial dealings and ultimately the scheme at issue.

Moreover, State Farm also intends to demonstrate that the Kiner Defendants provided medically unnecessary treatment by showing, among other things, that the care was ordered and provided not because patients needed it, but because Kiner Defendants were financially dependent on Lentsi and the illegal kickback relationship that existed at 100 Dyckman. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs.*, 375 F. Supp. 2d 141, 156 (E.D.N.Y. 2005) (doctor's bank records and tax returns relevant to the motive to engage in fraudulent scheme); *State Farm Mut. Auto. Ins. Co. v. McGee*, 2012 WL 8281725, at *2-3 (E.D.N.Y. Feb. 21, 2012) (bank statements and tax returns relevant to motive).   State Farm expects to be able to demonstrate the doctors' financial dependence by showing that although the doctors received only a small portion of the amounts actually earned by them, those amounts represented a significant portion of the doctors' overall annual compensation.  Tax returns and bank records would reveal this information.  Tax returns would also indicate how Kiner reported money from 100 Dyckman, as wages, business income, or otherwise; and would establish the actual profits earned by Kiner due to the scheme.  At the very least, such evidence is relevant to motive.

Courts have routinely ordered production of bank records and tax returns for precisely these reasons in precisely these circumstances.  *CPT Med. Servs.*, 375 F. Supp. 2d at 156-56 (ordering production of doctor's bank records and tax returns as relevant to the issue of profits and motive where State Farm had alleged medical services were not performed pursuant to medical necessity, but for the defendants' financial gain); *McGee*, 2012 WL 8281725, at *2-3 (compelling production of bank statements and tax returns as relevant to motive, profits from scheme, and relationships between the defendants); *State Farm Mut. Auto. Ins. Co. v. Fayda*, No. 14 CIV. 9792 [Dkt. 100] (denying similar objections by Defendants Fayda and Orenstein); *State Farm Mut. Ins. Co. v. Policherla*, 2009 WL 2170183, at *2 (E.D. Mich. July 20, 2009) (granting

discovery of financial information to assess the financial relationship among the defendants, the structure of the enterprise, measure the scope and extent of defendants' fraud, prove motive, identify other witnesses who may have participated in the scheme, and to prove damages); *Resolution Trust Corp. v. Greif*, 906 F. Supp. 1446, 1452 (D. Kan. 1995) (bank records relevant because they "might reveal secret payments . . . [and] financial relationships").  Such records will also help State Farm identify whether Kiner has concealed his assets or income.  *See OHM Res. Recovery Corp. v. Indus. Fuels & Res., Inc.*, 1991 WL 146234, at *4 (N.D. Ind. July 24, 1991) (finding that "financial records[] may well disclose efforts to drain-off or conceal assets and income.").  Any effort to conceal assets or income is powerful evidence of Kiner's conduct, and among other things, demonstrates consciousness of guilt.  *See Uni-World Capital L.P. v. Preferred Fragrance, Inc.*, 2014 WL 3417281, at *13 (S.D.N.Y. July 10, 2014) (finding that an insistence to keep quiet "is classic 'consciousness of guilt' evidence" in a civil matter).

### 2.     This Court Has Already Ruled on the Discoverability of Bank Records and Tax Returns in This Case.

Not only, however, is the material sought relevant, discoverable, and routinely found producible by other courts, this Court has already addressed precisely this issue in this case in ruling on virtually identical objections raised by Defendants Fayda and Orenstein.  *See Fayda*, No. 14 CIV. 9792 (S.D.N.Y. Jul. 21, 2015) [Dkt. 100].  In endorsing State Farm's explanations for why these materials should be produced as to Fayda and Orenstein, this Court wrote:  "No conference or formal motion necessary.  Plaintiff has established that the requested information is relevant and has shown a compelling need for the tax returns sufficient to overcome the quasi-privilege for such documents."  *Id.*  There is no reason why a different analysis should apply to Kiner's bank records and tax returns.

###### 3.      Defendants' Objections to Production of Bank Records and Tax Returns Are Without Merit.

Finally, Defendants' articulated objections to the discovery do not pass muster. Defendants object to producing Kiner's bank records and tax returns because State Farm has not alleged that Contemporary was owned by a layperson, and therefore this is "not a 'follow-the-money case' where financial records are used to track where money is going to prove layperson ownership." But as explained above, this argument miscategorizes State Farm's case and completely ignores the fact that financial transactions and the way such transactions were conducted were central to Defendants' scheme, and understanding those transactions is a legitimate area of inquiry for State Farm. As discussed above, evidence suggests that, at the very least, Kiner and Contemporary were involved in the payment of kickbacks through a variety of financial transactions including the use of check cashiers. Lentsi asserted the Fifth Amendment when asked whether Kiner paid kickbacks for access to patients at 100 Dyckman. (*Id.* at 96.)

Moreover, while it is unclear if, as Defendants claim, Kiner was the real owner of his own acupuncture practice, Contemporary, Kiner does appear to have played a direct role in facilitating control of Dr. Fayda's practice, Dyckman Neighborhood, by a layperson, Lentsi. It was Kiner who appears to have made the $30,000 "loan," based on an oral agreement, that was never paid back, which constituted the seed capital to start Dyckman Neighborhood. (Fayda Deposition Transcript at 36-40.) Thus, evidence regarding Kiner's personal financial activities contained in bank records and tax returns, at a minimum, will provide evidence relevant to the issue of who owned and controlled Dyckman Neighborhood. In addition, Kiner's protestations notwithstanding, there may very well be evidence that Kiner was not the "true owner" or only owner of Contemporary. Lentsi asserted the Fifth Amendment in response to the question of

whether he, a layperson, shared in the profits of Kiner's acupuncture practice, Contemporary. (Lentsi Deposition Transcript at 100.)

Defendants also argue that "many of the financial records [requested] are joint bank accounts (Kiner's wife, son, and parents) and joint tax returns (Kiner's wife)," who are non-parties, and therefore not relevant and private. Defendants are mistaken. To the extent Kiner has joint accounts with his wife or his family, if Kiner had full access to the accounts at the time of the scheme, then Kiner had the ability to direct unlawful payments through those accounts. *See Resolution Trust Corp.*, 906 F. Supp. at 1452 (bank records are relevant because they "might reveal secret payments . . . [and] financial relationships"); *see also Dean v. Anderson*, 2002 U.S. Dist. LEXIS 11536, at *9–10 (D. Kan. June 6, 2002) (holding discoverable joint account between defendant and non-party wife, finding that "[c]onfidentiality does not act as a bar to discovery and is generally not grounds to withhold documents from discovery"). Importantly, Kiner has the ability to mark any such records confidential and they will receive full protection under the protective order in place in this case. As has been demonstrated by discovery to date, Defendants used accounts of others and the accounts of entities which appear on their face to be unconnected, like TTRT, Inc., Better Billing, and EBR Network, to perpetrate the scheme and to prevent discovery of their activities. Any account over which Kiner had authority has the potential to have been used to advance the fraud, and thus information about it has at least the potential to lead to the discovery of admissible evidence. Accordingly, information about such accounts more than meets the standard appropriate for discovery. To the extent it contains sensitive information of others, it can be protected through designation under the protective order.

13

**B.      Documents from Kiner's Other Professional Corporations and Healthcare Practices Are Discoverable.**

The Court should also order the Kiner Defendants to produce requested information related to professional corporations and healthcare practices other than Contemporary and locations other than 100 Dyckman ("Other Practices").  A number of discovery requests call for production of information concerning Kiner's activities at other practices[2].  Among those in dispute are requests that asks Defendants for (a) agreements, including leases, regarding activities at Other Practices; (b) documents reflecting or relating to payments relating to such agreements; and (c) transcripts of testimony[3].  Defendants have agreed to produce medical records related to these Other Practices, but refuse to produce business records, financial records, and transcripts, arguing that legitimate inquiry in this case is limited to activity at 100 Dyckman.  The requested materials should be produced because the Court has already addressed the identical issue and the information is relevant or at the very least likely to lead to the discovery of admissible evidence.

First, this Court has already addressed precisely this issue.  Defendants Fayda and Orenstein objected to producing any information concerning activities at locations other than 100 Dyckman, arguing that this case concerns 100 Dyckman and activity at other locations is irrelevant.  *See Fayda*, No. 14 CIV. 9792 [Dkt. 100].  State Farm argued that the scheme alleged in the complaint involved providers who operated at multiple locations and in fact describes

---

[2]      A number of requests, which are not limited by location, call for all responsive documents and they include among the requested items information regarding Other Practices. *See* Ex. A, Requests Nos. 1, 4-8, 10-12, 17, 20; *see also* Ex. B, Interrogatories Nos. 1, 5, 6-10; and Second Set of Kiner Document Requests 1-10, 13.

[3]      The parties met and conferred concerning these requests and this issue and reached an agreement on some issues, but then disagreed as to the scope and terms of that agreement.  The parties have agreed not to belabor this negotiation, but to focus the issues as set forth herein for purposes of this motion.

treatment of patients at locations other than 100 Dyckman, that the financial relationships at other locations were relevant to whether the care at issue was medically necessary, that such information would be relevant to defendants' financial dependence on others, and that such information would be relevant to motive.  *Id.*  The Court rejected Fayda and Ornstein's contentions and granted State Farm's motion to compel without a conference or formal motion. *Id.*  There is no reason to view the discovery as to Kiner any differently.

Here, information regarding Other Practices is relevant and discoverable.  The scheme alleged in the Complaint involves healthcare providers who operated at multiple locations.  It includes providers who rendered treatment to patients at any location at which they could gain access to patients, and they did so either by becoming essentially an "employee" of a non-physician who controlled a location or paying kickbacks to a non-physician who controlled a location.  The financial relationships between the providers and the locations at which they treated patients are critical and will, among other things, explain why the services were medically unnecessary – that is, treatment was provided not because it was necessary, but as a product of improper financial incentives.  Indeed, agreements with providers at other locations and payments associated with those agreements could constitute direct evidence of kickbacks at other locations.  If Kiner or Contemporary paid kickbacks anywhere, it would tend to show, among other things, that the care they provided was the result of financial incentives and not the product of medical need.  Thus, discovery into Defendants' relationships at any location where they provided services is appropriate.

Moreover, such conduct is relevant to show proof of motive, opportunity, intent, preparation, plan, knowledge, or absence of mistake or accident.  *See e.g., United States v. Hatfield*, 685 F. Supp. 2d 320, 327 (E.D.N.Y. 2010) (finding prior bad acts of insurance fraud

15

probative of intent and lack of mistake); *United States v. Chan*, 2002 U.S. Dist. LEXIS 391, *15 (S.D.N.Y. Jan. 13, 2002) (bad acts, including insurance fraud, happening during alleged conspiracy admissible because failure of other schemes led Defendant to commit instant crime and other schemes included similar defendants); *see also,* Fed. R Evid. 404(b) (prior bad acts admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident"); Fed. R. Evid. 608(b) (evidence of prior acts which relate to a witness's truthfulness admissible to impeach witness's credibility).

Additionally, the requested information could reveal whether patients whose care was reimbursed by No-Fault insurance at 100 Dyckman were treated differently from patients treated at other locations where patients care was paid by some source other than No Fault Benefits. Dealings at these other practices may also involve connections to other Defendants or others involved in the scheme that also operated at multiple locations. Finally, Kiner may have discussed 100 Dyckman or Contemporary in his testimony.

It is noteworthy that Kiner is willing to produce medical records from the Other Practices, thereby implicitly conceding that treatment at other locations is relevant. But in refusing to produce the corresponding financial and business records, he only provides part of the picture. It is impossible to judge the need or value of those services at Other Practices without understanding the circumstances under which they were rendered and whether they too were the produce of improper financial motivations.

For all of these reasons, information concerning locations other than 100 Dyckman and practices other than Contemporary is likely to lead to the discovery of admissible evidence. Courts in similar circumstances, including this one, have allowed such discovery. *See, e.g.*, *McGee*, 2012 WL 8281725, at *3-4 (ordering production regarding other businesses of doctor

16

defendant to allow comparison the businesses); *Fayda*, No. 14 CIV. 9792 [Dkt. 100].

## VI.    CONCLUSION

Based on the foregoing, the Court should enter an Order compelling Defendant Kiner to:

1)  Respond to discovery requests regarding Defendant Kiner's personal bank records;

2)  Respond to discovery requests regarding Defendant Kiner's tax returns;

3)  Respond to discovery requests regarding professional corporations and healthcare practices other than Contemporary;

4)  Grant such other relief as the Court deems just and proper.

Dated:  September 25, 2015                    Respectfully submitted,

                                  By:     /s/ Michael M. Rosensaft
                                          KATTEN MUCHIN ROSENMAN LLP
                                          575 Madison Avenue
                                          New York, NY 10022-2585
                                          Telephone:  212.940.8800
                                          michael.rosensaft@kattenlaw.com

                                          Ross O. Silverman
                                          Jonathan L. Marks
                                          Andrew D. Welker
                                          KATTEN MUCHIN ROSENMAN LLP
                                          525 West Monroe Street
                                          Chicago, Illinois 60661-3693
                                          Telephone:  312.902.5200
                                          Facsimile:  312.902.1061
                                          ross.silverman@kattenlaw.com
                                          jonathan.marks@kattenlaw.com
                                          andrew.welker@kattenlaw.com

                                          *Attorneys for Plaintiff*
                                          State Farm Mutual Automobile Insurance
                                          Company

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of September 2015, a true and correct copy of the

foregoing Motion and Brief in Support of Motion was served on counsel for all parties via ECF.


/s/      Michael M. Rosensaft
One of the attorneys for State Farm